

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
10-24-11
OCT 2 4 2011
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| THE UNITED STATES OF AMERICA, ex rel KENNETH CONNER, | )<br>)<br>) |
| Plaintiff, | ) CASE NO. 11 CV 4458<br>)<br>) *QUI TAM LAWSUIT* |
| vs. | )<br>) |
| PETHINAIDU VELUCHAMY; AMRISH MAHAJAN; JOHN BENIK; THOMAS PACOCHA; JAMES MURPHY; RIC BARTH; PARAMESWARI VELUCHAMY; ARUN VELUCHAMY, ANU VELUCHAMY; JAMES ROTH, RONALD TUCEK, PATRICK McCARTHY; JAMES REGAS; THE VELUCHAMY FAMILY FOUNDATION; ADAMS VALUATION CORPORATION; and DOUGLAS ADAMS | ) FILED UNDER SEAL<br>)<br>) Hon. James F. Holderman,<br>)<br>) Magistrate Judge Jeffrey Cole<br>)<br>)<br>)<br>)<br>) JURY TRIAL DEMANDED<br>) |
| Defendants. | )<br>) |

### AMENDED COMPLAINT UNDER FEDERAL FALSE CLAIMS ACT

Plaintiff Kenneth J. Conner, by and through his attorneys Joseph T. Gentleman and Matthew J. Sullivan, states as follows for his complaint under the Federal False Claims Act, 31 U.S.C. §3729, et seq., against defendants Pethinaidu Valuchamy, Amrish Mahajan, John Benik, Thomas Pacocha, James Murphy, Ric Barth, Parameswari Veluchamy, Arun Veluchamy, Anu Veluchamy, James Roth, Ronald Tucek, Patrick McCarthy, James Regas, the Veluchamy Family Foundation, Adams Valuation Corporation, and Douglas Adams.

### Nature of the Case

1. This action, brought on behalf of the United States, concerns various knowing false statements and omissions caused to be made by certain officers, directors and employees of

1

Mutual Bank of Harvey (collectively, "Mutual Bank") to the Federal Deposit Insurance Corporation ("FDIC") in part in order to reduce deposit insurance premiums due to the FDIC and otherwise conceal risk. In particular, Mutual Bank knowingly overstated and concealed the value of the collateral on its commercial real estate loans from the FDIC. As shown herein, plaintiff Kenneth Conner ("Conner"), then an employee of the bank in charge of reviewing appraisals, repeatedly informed management that defendant Adams Appraisal Corporation ("Adams") was grossly overvaluing collateral on commercial real estate loans. However, Conner was instructed by management to ignore the issue. Mutual Bank paid dramatically lower assessments to the FDIC for deposit insurance as a result of defendants' false statements and concealment concerning the inflated appraisals. Furthermore, the FDIC insurance fund sustained substantial losses as a direct result of the concealment because additional capital injections would otherwise have been required of the bank-owner defendants and most of the concealed loans could never even have been made. This suit seeks to recoup the deposit insurance assessments that rightfully should have been paid to the FDIC and that portion of the FDIC insurance fund's loss that relates to the illegal loans.

## The Parties

2. Relator, Kenneth Conner, an adult citizen of Indiana, is a former employee of Mutual Bank of Harvey.

3. Defendant Pethinaidu Veluchamy, an adult citizen of Illinois, is the former owner and Chairman of the Board of Directors of Mutual Bank of Harvey. Veluchamy ran the bank and had ultimate say on all big decisions concerning Mutual Bank.

4. Defendant Parameswari Veluchamy, an adult citizen of Illinois, is a former owner and member of the Board of Directors of Mutual Bank.

5. Defendant Arun Veluchamy, an adult citizen of Illinois, is a former owner and member of the Board of Directors of Mutual Bank.

6. Defendant Anu Veluchamy, an adult citizen of Illinois, is a former owner and member of the Board of Directors of Mutual Bank.

7. Defendant Steven Lakner, an adult citizen of Illinois, is a former member of the Board of Directors of Mutual Bank.

8. Defendant James Roth, an adult citizen of Illinois, is a former member of the Board of Directors of Mutual Bank.

9. Defendant Ronald Tucek, an adult citizen of Illinois, is a former member of the Board of Directors of Mutual Bank.

10. Defendant Patrick McCarthy, an adult citizen of Illinois, is a former member of the Board of Directors of Mutual Bank.

11. Defendant James Regas, an adult citizen of Illinois, is a former member of the Board of Directors of Mutual Bank.

12. Defendant Amrish Mahajan, an adult citizen of Illinois, is the former President and a former member of the Board of Directors of Mutual Bank of Harvey. Mahajan was in charge of the day-to-day operations at the bank.

13. Defendant James Murphy, an adult citizen of Illinois, is a former senior vice president of Mutual Bank of Harvey. Murphy was Conner's supervisor and was in charge of loan review.

14. Defendant John Benik, an adult citizen of Illinois, is a former senior vice president and Chief Lending Officer of Mutual Bank of Harvey.

15. Defendant Thomas Pacocha, an adult citizen of Illinois, is a former executive vice president of Mutual Bank of Harvey.

16. Defendant Ric Barth, an adult citizen of Illinois, is a former senior vice president of Mutual Bank of Harvey.

17. Defendant Adams Valuation Corporation is an Illinois Corporation with its principal place of business in Oakbrook Terrace, Illinois.

18. Defendant Douglas Adams, an adult citizen of Illinois, is the President of Adams Valuation Corporation.

19. On information and belief, the Velchamay Family Foundation is a former owner of Mutual Bank that is controlled by Pethinaidu Veluchamy.

## Jurisdiction

20. This Court has jurisdiction over this matter pursuant to 31 U.S.C. §3732(a) (False Claims Act cases), 28 U.S.C. §1331 (claims arising under the laws of the United States), and 28 U.S.C. § 1345 (claims brought by the United States).

## Venue

21. Venue is proper in the Northern District of Illinois pursuant to 31 U.S.C. §3732(a) because Defendants have regularly and continuously transacted business in this District and because the acts proscribed by the Federal False Claims Act occurred in this District.

## Facts

**A. Kenneth Conner's Review of Appraisals of Collateral on Commercial Real Property Loans.**

22. Plaintiff Kenneth Conner was employed by Mutual Bank and a predecessor entity from August 2000 until October 2007. Conner was transferred to the Harvey, Illinois, headquarters of Mutual Bank in fall 2005.

23. Immediately after Conner's transfer to the Harvey headquarters, his job focused increasingly on reviewing appraisals of property that secured loans on commercial real estate. Within two months of the transfer, more than half of Conner's time was spent reviewing such appraisals.

24. Conner continued to spend the majority of his time reviewing appraisals until he was terminated by Mutual Bank in October 2007.

25. As Conner reviewed the appraisals at Mutual Bank, he observed that Mutual Bank was using a single company for more than half of its appraisals, Adams Valuation Corporation.

26. It is well understood in the banking industry that having a high concentration of appraisals done by any one company puts a bank at risk because it fails to diversify the risk of faulty work.

27. Based on Conner's review of the appraisals conducted by Adams, they were regularly inflated by 20-30 percent. As detailed more fully below, Conner repeatedly brought this to the attention of management but was told to ignore the issue.

28. During his two years at the Harvey headquarters of Mutual Bank, Conner personally reviewed approximately 75 appraisals for commercial real estate loans that were inflated.

B. **Particular Examples Of Inflated Appraisals Known to Mutual Bank Management**

29. In 2006, Conner was asked to review an appraisal for Venturella Resort and Spa located in Orlando, Florida that had been conducted by Adams.

30. Venturella was to be a renovation of an existing hotel a little over a mile from Walt Disney World. Nonetheless, Adams' appraisal of the property did not rely on any comparable properties near Walt Disney World to forecast revenues from the property.

31. Instead, Adams relied solely on an extreme high-end property called The Peabody Hotel, which was by a significant margin the most expensive hotel in the broader Walt Disney/Convention Center area. The hotels' locations were dissimilar. The Peabody was located directly adjacent to Orlando's convention center. The proposed Venturella, by contrast, was located half-a-block from a busy intersection near a highway interchange. It was adjacent to a Denny's, an Olive Garden, a Burger King and a Holiday Inn Express.

32. While Adams' appraisal of the property did identify several hotels in the area that were comparable, it did not use any of those hotels in its valuation. Instead, it assumed without any plausible basis that the Venturella would have the same average daily rate per room as the Peabody.

33. The other comparables identified were closer geographically to the Venturella than the Peabody and had other characteristics much more similar to the proposed Venturella.

34. The Peabody was a high-end luxury hotel, located in a 27-story building that had landmark appeal to it and balconies connected to many of its rooms. By contrast, the Venturella was to be only a five-story building with rooms that had no balconies. The Peabody's rooms were likewise significantly larger than the rooms at the proposed Venturella.

35. The Peabody's average daily rate per room was more than $400. The other comparables' average daily room rates were all less than $300. Nonetheless, Adams assumed for purposes of its valuation that the Venturella would have an average daily room rate in excess of $400.

36. Based on Conner's review, Adams' appraisal, which valued the property at approximately $22 million, overvalued the property by a minimum of $9.7 million. Conner made this determination by analyzing comparable properties and assuming that the Venterella, as

gut rehab, would perform somewhat better than other hotels near its location with similar amenities.

37. Conner told Murphy that he believed that the Venturella was overvalued by around $10 million. Murphy responded that "Amrish and the Board want to do the deal anyway because the borrower is going to get the bank out of trouble with other properties."

38. Shortly thereafter, Conner was instructed by Murphy to cease work on the Venturella appraisal review and not to put the work that Conner had completed in the appraisal presentation.

39. The Venturella was supposed to open in approximately 2008 under the plans submitted to the Bank. The Venturella never opened, and, on information and belief, the loan defaulted.

40. In 2007, Conner reviewed an appraisal for two-story retail/office building in Mount Olive, New Jersey. The appraisal was unsigned and appeared to be an incomplete rough draft. The property was appraised for approximately $2.5 million. However, the draft appraisal failed to articulate any coherent basis for the $2.5 million figure. Conner reviewed the other comparison properties that were presented in the incomplete appraisal and found that they justified a value of only about $1.5 million.

41. Conner informed Murphy that he could not approve the appraisal because it was an incomplete draft and significantly overvalued the property.

42. Shortly thereafter, John Benik called Conner into his office. Benik was visibly angry. Benik upbraided Conner for interfering with a deal that he said that the Board wanted to do. Conner explained that the appraisal was just a rough draft and that it appeared to overvalue the property by almost 70 percent. Benik responded by saying "What are you doing? You are

7

causing problems." Benik told Conner to "just go ahead and approve the appraisal." When Conner refused, Benik ordered Conner to cease work on the appraisal review.

43. On information and belief, the loan related to the Mount Olive property defaulted.

44. A two-story retail property in the Beverly neighborhood of Chicago was likewise valued by Adams at approximately $1.5 million when the actual value of the property was only about $1 million.

45. An empty lot on the south side of Chicago was valued at $625,000 by Adams, whereas Conner determined, by analyzing comparables, that it was worth a maximum of $500,000. Conner informed Murphy and Barth that the lot was overvalued. Murphy and Barth ignored Conner, and the loan was modified based on the $625,000 appraisal. Conner later learned that an independent appraisal conducted at approximately the same time valued the lot at $490,860.

46. Other overvaluations include a seven figure overvaluation of the Holiday Inn Rolling Meadows and a six figure overvaluation of loft condo conversion in the Logan Square neighborhood of Chicago. The loft condo conversion in Logan Square was valued on par with comparable buildings in the Bucktown and Wicker Park neighborhoods, which are considered more expensive neighborhoods than Logan Square.

### C. Additional Facts Demonstrating Management's Knowledge of Adams Appraisal's Practice of Inflating Valuations

47. In late 2006, a second appraisal was done of a hotel property in Evansville, Indiana, that Adams had previously valued at $21 million. The second appraisal was ordered from a different firm. The new firm determined that the value of the property was only $12 million, stabilizing at $13 million. The new valuation was presented to the entire Board of Directors, as well as Jim Murphy and Tom Pacocha, who were thus all aware that Adams had

8

overvalued the property by nearly 100 percent. Nonetheless, Mutual Bank continued to use Adams for more than half of its appraisals.

48. Adams likewise regularly inflated its valuations of service stations. Adams' entire methodology for valuing service stations was faulty because they used a market capitalization rate that was for retail buildings rather than service stations.

49. All other valuation companies that Conner dealt with used the higher capitalization rate specific to service stations, and thus arrived at much lower valuations for service stations. Adams by contrast inflated their valuations of service stations by using a capitalization rate that was far too low.

50. Notably, the gasoline/convenience store industry was a particular area of concentration for Mutual Bank's loan portfolio. *See* Office of Inspector General Loss Review at 4.

51. Conner informed Murphy of the issue three to four times and likewise informed Benik and Ric Barth. All three were dismissive and would respond simply by stating that Adams was an "approved" appraiser.

52. In just over two years at the Harvey branch, Conner identified to Mutual Bank approximately 75 appraisals that significantly overvalued the underlying real estate collateral. Many of these were overvalued by 20-30 percent or more. Furthermore, the majority of the overvalued appraisals were conducted by Adams.

53. Except where specifically instructed not to by management, such as in the cases of the Venturella and Mount Olive properties, Conner generated an appraisal review report that was placed in the loan file. The report explained why he believed the appraisal was overvalued and by how much he believed it was overvalued.

54. Except for one instance involving a single-family residential mortgage, Mutual Bank ignored the information Conner provided.

### D. "Your Job Is To Approve These Appraisals, Not To Question Adams' Conclusions."

55. Jim Murphy was transferred to the Harvey headquarters at the same time as Conner. Murphy was in charge of loan review at the bank, including review of new loans. As part of his responsibility, Murphy was ultimately responsible for loan review.

56. On at least six occasions, Murphy scolded Conner for criticizing Adams' appraisals. Murphy instructed Conner: "Your job is to approve these appraisals, not to question Adams' conclusions." These conversations would typically occur when Conner pointed out that an Adams appraisal was overvalued.

57. Murphy further made clear that he did not want Conner to make determinations of how much an appraisal was overvalued: "We don't need you spending all this time figuring out what the property is worth. We just need you to approve them."

58. Nonetheless, Conner continued to conduct full reviews of the appraisals, as he believed this was necessary to competently complete his job duties.

### E. "If 'Velu' Wanted Good Appraisals, You Would Be Reviewing Good Appraisals."

59. It was the practice of bank president Amrish Mahajan to walk the office and talk to the employees. In Fall 2006, during one of Mahajan's walk-throughs, Conner approached Mahajan to inform him of the inflated appraisals. Conner explained to Mahajan that many of the appraisals that he had been reviewing were overvalued by 20-30 percent. Mahajan replied, "I heard there was a problem with some of the appraisals. I'll set up a meeting with you and Jim [Murphy]." The meeting never occurred.

60. On multiple occasions, Conner reminded Murphy that there was to be a meeting with Mahajan regarding the appraisal problem. Murphy would simply change the subject.

61. In Fall of 2006, Conner told Murphy that he was thinking of approaching Mutual Bank's chairman Pethinaidu Veluchamy regarding the appraisal issue. Murphy responded: "Velu does not need you to tell him that the appraisals are bad. If Velu wanted good appraisals, you would be reviewing good appraisals." Conner asked Murphy if he knew for a fact that Velu was aware of the valuation problem. Murphy replied, "Yes, do you think he is an idiot?"

### F. Mutual Bank's Failure

62. Conner was terminated in October 2007 about a week after his meeting with John Benik where he refused Benik's order to approve the incomplete appraisal of the Mount Olive, New Jersey property.

63. In July 2009, Mutual Bank failed.

64. When the Office of Inspector General conducted its loss review of Mutual Bank, "examiners noted concerns with the appraisal company most commonly used by the bank, including the company's questionable support for comparables, capitalization rates, and final values and the potential lack of objectivity and diversification of the appraisal work in general."

65. The Inspector General further noted that Mahajan as President of the Bank, "exerted a great deal of influence and control over all facets of bank operations." Mahajan, according to a witness cited in the report, "frequently provided borrower information to the loan officers with orders that certain loan deals had to be funded" and "it was then up to the lending staff to find a way to make deals work."

66. According to the Inspector General's report, the FDIC insurance fund sustained an estimated loss of $656 million from Mutual Bank's failure.

### G. The "Risk-Based" System of FDIC Deposit Insurance Assessments

67. Pursuant to statutory mandate, the FDIC has promulgated a "risk-based assessment system" for determining deposit insurance premiums.

68. The statute sets forth in general terms what the risk-based system is to take into account: "(i) the probability that the Deposit Insurance Fund will incur a loss with respect to the institution, taking into consideration the risks attributable to—(I) different categories and concentrations of assets; (II) different categories and concentrations of liabilities, both insured and uninsured, contingent and noncontingent; and (III) an other factors the Corporation determines are relevant to assessing such probability; (ii) the likely amount of any such loss; and (iii) the revenue needs of the Deposit Insurance Fund." 12 U.S.C. § 1817(b)(1)(C).

69. The FDIC relies upon its annual examinations of the bank and quarterly "call reports" submitted by the bank to the FDIC to determine the bank's deposit insurance assessment.

70. Based on the FDIC's evaluation of the bank's capital and what the FDIC calls its "supervisory evaluation," an insured bank is assigned a "risk category" from I-IV.

71. Risk Category I consists of banks with the lowest risk. To be classified as Risk Category I, a bank must be both "well capitalized" and in the highest supervisory group, meaning that the bank is "financially sound with only a few minor weaknesses." 12 C.F.R. §327.9.

72. Risk Category IV, by contrast, consists of banks that are "undercapitalized" that are in the lowest supervisory group, meaning that the institution poses "a substantial probability of loss to the Deposit Insurance Fund unless effective corrective action is taken." 12 C.F.R. §327.9.

73. The risk category assigned by the FDIC makes an enormous difference in a bank's assessment for deposit insurance. For example, when Conner started his employment at Mutual Bank, the FDIC rate schedule allowed for well capitalized banks to pay no deposit insurance premiums. Subsequently, the FDIC's rate schedule, stated in terms of basis points, was as follows (12 C.F.R. § 327.10):

TABLE 1 TO PARAGRAPH (a)

|  | Risk Category | | | | |
|---|---|---|---|---|---|
|  | I* | | II | III | IV |
|  | Minimum | Maximum | | | |
| Annual Rates (in basis points) | 2 | 4 | 7 | 25 | 40 |

*Rates for institutions that do not pay the minimum or maximum rate vary between these rates.

74. The FDIC's assessment rates were subsequently raised effective January 1, 2007, as follows:

TABLE 1 TO PARAGRAPH (b)

|  | Risk Category | | | | |
|---|---|---|---|---|---|
|  | I* | | II | III | IV |
|  | Minimum | Maximum | | | |
| Annual Rates (in basis points) | 5 | 7 | 10 | 28 | 43 |

*Rates for institutions that do not pay the minimum or maximum rate vary between these rates.

75. During the time that Conner worked there, Mutual Bank was assigned Risk Category I and therefore paid at or near the lowest possible assessment rates to the FDIC for its deposit insurance.

**H. The False Claims**

    **a. Bank Examinations – Mutual Bank's Systematic Concealment of Commercial Real Estate Loans In Excess Of Loan-to-Value Ratio Limit**

76. The majority of Mutual Bank's loan business was commercial real estate.

77. Mutual Bank "traditionally concentrated its loan portfolio in the hospitality and gasoline/convenience store industries." Office of Inspector General Loss Review at 4.

78. The FDIC provides minimum standards for loan-to-value ratios for real estate lending. 12 C.F.R. §365.2. While banks are to establish their own loan-to-value ratio limits, they may not exceed the supervisory limits set by the FDIC. The FDIC's supervisory limit for commercial real estate loans is an 80 percent loan-to-value ratio. 12 C.F.R. §365, App. A.

79. Within certain limits, the FDIC permits exceptions to this rule for credit-worthy borrowers who do not fit within the FDIC's loan-to-value ratio limit. However, the FDIC requires that the bank create a "lending policy exception report" identifying each such loan that sets forth "all the relevant credit factors that support the underwriting decision." 12 C.F.R. §365, App. A.

80. Lending policy exception reports are specifically reviewed by the FDIC during bank examinations: "Lending policy exception reports will also be reviewed by examiners during the course of their examinations to determine whether the institution's exceptions are adequately documented and appropriate in light of all of the relevant credit considerations. An excessive volume of exceptions to an institution's real estate lending policy may signal a weakening of its underwriting practices, or may suggest a need to revise the loan policy." 12 C.F.R. § 365, App. A.

81. The FDIC further had a cap on loans in excess of the supervisory loan-to-value limits for all commercial, agricultural, multifamily or other non-1-4 family residential properties of 30 percent of total capital. 12 C.F.R. § 365, App. A.

82. Mutual Bank's commercial real estate loans were substantially all twenty-percent down loans.

83. By using inflated appraisals, Mutual Bank was able to mask the fact that the loans actually had loan-to-value ratios that were considerably in excess of the eighty percent limit. In substance, the inflated appraisals artificially increased the loan-to-value denominator in order to make the loan-to-value ratios appear much lower than they really were.

84. Mutual Bank knowingly concealed from the FDIC the fact that its loans did not conform to the FDIC's loan-to-value limits by failing to generate the required exception report for loans that had a loan-to-value ratio in excess of eighty percent for the FDIC to review during its examinations of Mutual Bank.

85. By the same means, Mutual Bank knowingly hid the fact that the aggregate amount of its commercial real estate loans in excess of the FDIC's loan-to-value limit exceeded many fold the FDIC's limit of 30 percent of total capital.

### b. The Call Reports

86. Banks are required by the FDIC to submit quarterly "Call Reports" that show the financial condition of the bank. All assets and liabilities, including contingent assets and liabilities, must be reported in or otherwise taken into account in the preparation of the Call Report.

87. Together with the bank examination, the FDIC uses Call Report data to calculate deposit insurance assessments. 12 C.F.R. § 304.1(a).

88. A report of condition consists in part of the balance sheet, a securities schedule, a loan and leases financing receivables schedule, a deposit liabilities schedule, an "other assets" schedule, an "other liabilities schedule," a quarterly averages schedule, an off balance sheet items schedule, a memoranda, and a schedule of past due and nonaccrual loans.

89. Because of the inadequacy of the collateral and the inability of the commercial real estate that was the basis of its loans to generate the revenue necessary to service the loans, Mutual Bank knew that there was a substantial risk of default on many of its commercial real estate loans.

90. In the call reports, Mutual Bank misrepresented the quality of its collateral on its real estate loans to the FDIC on its call reports by *inter alia*: failing to identify non-accrual loans and failing to book proper loan-loss reserves for loans that it had reason to know had a substantial probability of default.

91. The actions of the Defendants also violated FASB 105 and any restrictions on high volatility commercial real estate exposure (HVCRE) and possibly other laws, rules or regulations governing the banking industry.

## Violations of False Claims Act

92. Mutual Bank had a duty to disclose that its commercial real estate loans had loan-to-value ratios in excess of the eighty percent limit by making exception reports available to the FDIC during the FDIC's bank examinations. 12 C.F.R. § 365, App. A.

93. Mutual Bank had a duty to disclose to the FDIC the inadequate collateral on its commercial real estate loans through its call reports submitted to the FDIC.

94. Each of the defendants had knowledge (as defined in 31 U.S.C. § 3729(b)(1)) of the inflated appraisals of commercial real property collateral, except that in the case of the two corporate entities, the principals of those entities had such knowledge.

95. Each of the defendants had knowledge (as defined in 31 U.S.C. § 3729(b)(1)) that the inflated appraisals were concealed from the FDIC during the FDIC's annual examinations of

Mutual Bank and in Mutual Bank's call reports submitted to the FDIC, except that in the case of the two corporate entities, the principals of those entities had such knowledge.

96. In violation of 31 U.S.C. § 3729(a)(1)(g), defendants knowingly caused to be submitted to the FDIC false records and knowingly caused to be concealed from the FDIC material information concerning the collateral on its commercial real estate loans, including but not limited to the fact that the loan-to-value ratios on its loans were in excess of FDIC limits.

## Damages Sustained By The FDIC Insurance Fund

97. By submitting the false claims and concealing the material information described above, Mutual Bank decreased its obligation to pay deposit insurance to the FDIC from approximately the first half 2005 until the bank closed in 2009.

98. If based on the actual loan-to-value ratios of Mutual Bank's commercial real estate loans, the loan-loss reserves booked on the loans would have been increased exponentially. This alone would have been sufficient grounds in itself for Mutual Bank to be given a higher risk rating during all relevant times.

99. The FDIC was damaged in excess of approximately $10.9 million in deposit insurance assessments that were not assessed as a result of the false claims.

100. Defendants' fraudulent concealment was likewise the proximate cause of a substantial amount of the losses that were sustained by the FDIC insurance fund with respect to Mutual Bank. As above, the FDIC sustained an estimated loss of $656 million (per the Office of Inspector General) because of Mutual Bank's bad loans.

101. An estimated $ 300-400 million of this loss is directly attributable to defendants' concealment of material information from the FDIC. These damages fall into two interrelated categories: 1) capital injections to Mutual Bank that would otherwise have been required by the

FDIC absent the fraudulent concealment; and 2) losses on bad loans that simply could never have been made absent the fraudulent concealment.

102. One primary means by which the FDIC manages its risk is to require banks to keep capital sufficient to offset the risk of their loans. In practice, this means that bank owners may be required by the FDIC to inject capital into their bank in order to make risky loans.

103. As above, the FDIC's rules address this issue specifically with respect to loans in excess of loan-to-value ratio limits. In particular, such loans can never exceed 30 percent of total capital, even if properly documented in exception reports. 12 C.F.R. § 365, App. A.

104. Thus, absent the concealment, the Mutual Bank owners would have had to inject many times more capital into the bank under FDIC rules in order for the bank to make the myriad loans in excess of the FDIC's loan-to-value limits that it did.

105. The flip side of the same coin is that, absent the concealment, Mutual Bank simply could never have made the "exception" loans in the first place because of the substantial amount of capital it would have had to inject into the bank under FDIC rules.

106. In either event, the effect was a massive loss to the FDIC insurance fund through bad loans that could never have been made and through Mutual Bank's lack of capital to offset the risks that they concealed from the FDIC.

107. Ultimately, the FDIC lost an estimated $300-400 million (out of a total FDIC loss of $656 million relating to Mutual Bank) on the commercial real estate loans with deliberately faulty appraisals that went bad. Such loss is directly attributable to defendants' false statements and concealment of the true loan-to-value ratios of these loans that allowed the loans to be made without adequate capital to offset the substantial risk.

108. Pursuant to 31 U.S.C. § 3729(a)(1) defendants are liable to the FDIC for not less than $5,000 and not more than $10,000 per false claim, plus triple the amount of its damages, an amount not less than $32.7 million with respect to the deposit insurance premiums and in the range of $900 million to $1.2 billion with losses to the FDIC insurance fund relating to the illegal loans.

WHEREFORE, Plaintiff respectfully requests that the Court enter a judgment in favor of the United States of an amount to be determined at trial plus all costs and attorney fees for this action and any other relief that is just and equitable under the circumstances.

Dated: October 24, 2011

Respectfully submitted,

UNITED STATES OF AMERICA, ex rel
KENNETH CONNER

By: _____
One of Its Attorneys

Joseph Gentleman
**JOSEPH GENTLEMAN P.C.**
33 N. Dearborn Street, Suite 1401
Chicago, Illinois 60602
Telephone: (312) 263-7000

Matthew J. Sullivan
**THE LAW OFFICE OF MATTHEW J. SULLIVAN LLC**
55 W. Wacker Drive
Suite 1400
Chicago, IL 60601
Telephone: (312) 912-8012